**WILLIAM C. RONEY & CO.,**
**Plaintiff-Appellee,**

v.

**The FEDERAL INSURANCE COMPA-**
**NY, Defendant-Appellant.**

No. 80–1778.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 21, 1982.

Decided April 7, 1982.

Gary R. Schellhase, Kerr, Russell & Weber, Detroit, Mich., for defendant-appellant.

George R. Ashford, Michael G. Vartanian, Detroit, Mich., for plaintiff-appellee.

* The Honorable Robert M. Duncan, United States District Court for the Southern District of Ohio, sitting by designation.

Before BROWN and KENNEDY, Circuit Judges and DUNCAN,* District Judge.

CORNELIA G. KENNEDY, Circuit Judge.

Federal Insurance Company (Federal) appeals from an order of summary judgment in which the United States District Court for the Eastern District of Michigan held that Wm. C. Roney & Company (Roney) was insured under a broker's blanket bond issued by Federal for losses caused by certain acts assumed by the District Court for purposes of the summary judgment motion to be dishonest and fraudulent acts by one of Roney's brokers. Federal denied coverage under the bond because of Roney's failure to disclose alleged acts of dishonesty by the broker in his prior employment. In addition to declaring coverage the District Court held that absent any inquiry by Federal, Roney had no duty to disclose any dishonest acts by its employees which occurred before their employment with Roney.

On June 1, 1968 Federal issued a broker's blanket bond to Roney. The bond insured Roney for losses resulting from the dishonest or fraudulent acts of its employees. The bond did not require individual applications for coverage on new brokers. Section 13 of the bond provided for the termination of coverage under certain circumstances. It reads in pertinent part:

.     .     .     .     .

This bond *shall terminate* (a) as to (i) any Employee of the Assured as soon as the Assured shall learn of *any* dishonest or fraudulent act or acts on the part of such Employee ... (emphasis added).

In December 1975, Federal revised the form of its brokers' blanket bonds. The revised form, which was never issued to Roney, contained different language regarding termination of coverage.[1] Roney's coverage continued under the original bond.

1. Section 19 of the revised bond provides:

Broker Ronald Swart was hired by Roney in January 1977. Prior to his employment with Roney, Swart had been employed as a registered representative with the brokerage firm of Loeb, Rhoades. In 1976, while working for Loeb, Rhoades Swart made an unauthorized purchase of stock for a customer's account. This transaction was investigated by the New York Stock Exchange and the Michigan Corporation and Securities Bureau. As a result of its investigation, Swart received an admonishment from the New York Stock Exchange. While the Exchange advised Swart to conduct himself in a more circumspect manner in the future, no formal disciplinary action was taken. At the same time, the Exchange unconditionally approved the transfer of Swart's broker's license to Roney. This transfer was also approved by the Michigan Corporation and Securities Bureau.

Roney was aware at the time it hired Swart that he had made the unauthorized transactions while at Loeb, Rhoades. Despite Roney's knowledge of Swart's past, Roney did not notify Federal of Swart's background. On two prior occasions Roney made special application to Federal when it sought to hire brokers known by Roney to have committed questionably dishonest acts in the past. These were the only other instances in which Roney had hired persons with suspect histories.

In December 1978, while Roney's bond was in effect, Roney learned that Swart committed dishonest and fraudulent acts in its employ. He was immediately discharged. Several suits were filed against Roney by persons damaged by Swart's actions. Roney notified Federal of these claims and requested assurance that any claims allowed against Roney would be covered by the bond and requested reimbursement for costs and attorney fees.

Federal denied coverage under the bond for the claims, asserting that Roney's knowledge of Swart's acts committed prior to his employment with Roney precluded coverage for acts committed by Swart while employed by Roney. In denying Roney's claim for coverage, Federal's claims agent referred to the language of the revised bond, rather than the language of the bond issued to Roney. The instant action for declaratory relief pursuant to 28 U.S.C. § 2201 followed.

In granting summary judgment, the District Court assumed, without deciding, that Swart's acts committed while with Loeb, Rhoades, were dishonest and fraudulent within the meaning of section 13. In light of the business arrangement between the parties and the wording of the revised bond, the District Court concluded that the language of section 13 must be read as terminating coverage only when the employer learns of any dishonest or fraudulent act on the part of such employee while in the employ of the employer. It further concluded that there was no duty on the part of Roney under Michigan law to voluntarily disclose prior dishonest or fraudulent acts committed by one of its employees before that employee's service with Roney commenced.

The parties agree that Michigan law applies in this diversity case and that the interpretation and construction of written contracts are matters of law. *Industrial Equipment Co. v. Emerson Electric Co.*, 554 F.2d 276, 284 (6th Cir. 1977); *Tompkins v. Gardner & Spry Co.*, 69 Mich. 58, 37 N.W. 43 (1888). As a prerequisite to applying rules of construction, a contract must be ambiguous, in that the parties' expressions are subject to more than one logical interpretation; otherwise, it is to be construed according to the plain meaning of the terms. *New Amsterdam Casualty Co. v. Sokolowski*, 374 Mich. 340, 132 N.W.2d 66 (1965).

.    .    .    .    .

[T]his bond shall terminate as to any General Partner or Employee of the Assured as soon as any partner or officer of the Assured, or any supervisory employee of the Assured, when such partner, officer or supervisory employee who is not in collusion with such General Partner or Employee shall learn of any dishonest act on the part of such General Partner or Employee in the service of the Assured or otherwise, whether such act be committed before or after the time this bond is effective ....

We find the language of section 13 to be ambiguous. Section 13 could be construed to prevent the termination of coverage for known dishonest or fraudulent acts with a prior employer because the common usage of the word "shall" is to denote simple future time, *see* Random House College Dictionary, 1980; "terminate" implies that there is prior effective coverage, *id.*; and a person is not an "employee" until he is employed. Conversely, knowledge of "any" dishonest or fraudulent act indicates that knowledge is without limit as to time or status. The difference between the two interpretations is between the inception and termination of coverage on one hand, and the exemption or exclusion of coverage on the other. Since section 13 is ambiguous, principles of contract construction must be employed to determine the parties' intent.[2]

In view of this ambiguity in the written embodiment of the parties' agreement, we must decide the priority and applicability of two relevant principles of contract construction. One rule states that an exclusion clause in a policy of insurance must be strictly construed against the insurer if it is ambiguous. *Francis v. Scheper*, 326 Mich. 441, 40 N.W.2d 214 (1949). Although a surety bond is not a policy of insurance it is ordinarily construed in similar fashion. The other rule is that the manner in which the parties themselves have treated an executory contract that has uncertain or ambiguous terms is entitled to great weight as affording a practical construction which the parties themselves have placed upon its intent and meaning by their conduct. *Detroit Greyhound Employees Federal Credit Union v. Aetna Life Ins. Co.*, 381 Mich. 683, 685–86, 167 N.W.2d 274 (1969). *Cf.*, Mich.Comp.Laws Ann. § 440.-2208 (UCC 2–208). The key word is "parties." To establish a practical construction there must be interpretation by one party and acquiescence by the other. *Davis v. Kramer Bros. Freight Lines*, 361 Mich. 371, 376, 105 N.W.2d 29 (1960).

A court's paramount responsibility is to construe a contract so as to effectuate the intent of the parties, if ascertainable. *Fox v. Detroit Trust Co.*, 285 Mich. 669, 677, 281 N.W.2d 399 (1938). Where a course of conduct removes an ambiguity in the written terms of an agreement, the rule of practical construction should take precedence over the rule that a contract of insurance is construed against its drafter. Once an ambiguity is removed by the parties' conduct, there is no longer a need to apply a rule of construction. Were we to make the rule of strict construction against the drafter paramount to the rule of practical construction, we would be imposing a per se penalty upon the drafter of ambiguous written terms, regardless of whether the ambiguity has been resolved by a mutually agreed upon subsequent course of conduct.

No Michigan case has expressly held that the rule of construction that ambiguous terms in an insurance contract must be construed against the drafter is the only applicable rule of contract construction in a contract of insurance. A review of *Francis*, the cases cited therein, and its progeny, reveals that this rule has been applied to ambiguous coverage provisions in insurance

2. In granting the motion for summary judgment the trial court appears to have focused on the language of section 19 of the revised bond and the mistaken reference to the revised bond by Federal's claims agent when he acted to reject Roney's claim for coverage. The language of some other instrument or the mistake of the claims agent does not create an ambiguity. Nor are they evidence of the parties' intent in *this* contract. The fact that Federal subsequently drafted a revised bond which used the language "prior" and "subsequent" does not show, by implication, that its use of the word "any" in the Roney bond was any less encompassing. The claims agent's mistaken reference to the revised bond, similarly, does not foreclose the same result from being reached under the language of the Roney bond. Neither the revised bond nor the letters relate to the Roney bond and do not constitute extrinsic aids to interpretation which can create an ambiguity or show intent with respect to this contract since they are not circumstances surrounding the execution of the bond but are subsequent events. *Detroit Greyhound Employees Federal Credit Union v. Aetna Life Ins. Co.*, 381 Mich. 683, 685, 167 N.W.2d 274 (1969). These two items were improperly considered by the District Court.

contracts, primarily automobile insurance, where there were no prior dealings between the parties, the insureds were laypersons and there was no evidence of actual intent through a course of conduct or some other manifestation. In *Detroit Greyhound,* the Michigan Supreme Court applied the rule of practical construction to resolve an ambiguity in the written terms of a group annuity contract. Any contractual doubt was held to be conclusively resolved by fourteen years of mutually agreeable performance. The issue of strict construction against the drafter was never discussed. The Michigan Supreme Court stated:

> "It is to be assumed that parties to a contract know best what was meant by its terms and are the least likely to be mistaken as to its intention; that each party is alert to protect his own interests and to insist on his rights; and that whatever is done by the parties during the period of the performance of the contract is done under its terms as they understood and intended it should be. Parties are far less likely to have been mistaken as to the meaning of their contract during the period when they are in harmony and practical construction reflects that meaning than when subsequent differences have impelled them to resort to law and one of them then seeks a construction at variance with their earlier practical construction of its provisions."

*Detroit Greyhound, supra,* at 692, 167 N.W.2d 274.

In this case there was no ambiguity in the parties' agreement at the time Roney's claim arose. Twice, when Roney sought to hire brokers with questionably blemished pasts, it contacted Federal prior to their employment for purposes of determining whether or not coverage could be obtained under the blanket fidelity bond for these individuals. Federal tailored its response to the facts of each situation; one to indicate that it would not consider the act in question to be a dishonest or fraudulent act within the meaning of section 13 of the Roney bond; the other time to limit a prospective broker's coverage to $25,000 instead of the $1,000,000 generally available. Roney's managing partner at the time Mr. Swart was hired testified on his deposition that Roney would notify Federal if it hired an employee with a prior serious problem or who had engaged in a prior act of dishonesty. He added that Roney would not hire anyone with a record of dishonesty. Mr. Sloan, the current managing partner, admitted that when Roney encountered background problems in a potential employee which it considered serious, it asked Federal if it would bond the individual. Thus, the practical construction is bolstered by the testimony of Roney's own agents. Federal and Roney have acquiesced in an interpretation of the bond at variance with that now asserted by Roney. Roney cannot isolate for consideration ambiguities in the written embodiment of the bond once that ambiguity has been resolved by a course of conduct. The course of conduct between the parties indicates that both understood "any" to encompass prior or subsequent fraudulent or dishonest acts; "shall terminate" to mean that the bond would fail to become effective in the first instance; and "employee" to be a point of reference with respect to Roney's bond coverage, so that liability for non-employee brokers was not assumed.

In addition, this practical construction is consistent with the purposes for which the bond was given. Roney expected to be covered, and Federal to be at risk, only for brokers with no known history of fraudulent or dishonest acts. Under any other construction Roney could hire a veritable Rogue's Gallery of new brokers and secure their coverage under Federal's fidelity bond because their known dishonest or fraudulent acts occurred prior to their employment with Roney. This would be unreasonable and unnatural since a reasonable expectation would be that Roney would not hire dishonest brokers. A construction of a contract that is fair and reasonable will prevail over one that is not. *See Wembelton Development Co. v. The Travelers Ins. Co.,* 45 Mich.App. 168, 172, 206 N.W.2d 222 (1973); *Kenyon v. Automatic Instrument Co.,* 160 F.2d 878, 883 (6th Cir. 1947).

Assuming *arguendo* that Swart's acts with Loeb, Rhoades were dishonest or fraudulent, Roney's knowledge of Swart's prior bad acts operated to exclude Swart's acts from coverage, pursuant to section 13 of the bond, as understood by both parties.

The parties having construed this bond by their conduct to preclude coverage if Roney had knowledge of dishonest acts that occurred prior to Swart's employment by Roney, we do not need to reach the issue of whether under some theory of common law duty fidelity bonds are defeated by a failure on the part of an applicant to furnish information not specifically called for.

Accordingly, this case is reversed and remanded to the District Court for further proceedings consistent with this opinion, including a determination on the reserved issue of whether or not Swart's acts were dishonest or fraudulent within the meaning of section 13 of Roney's bond as construed by the actions of the parties.