**FORD MOTOR COMPANY, Plaintiff–Appellee Cross–Appellant,**

v.

**NORTHBROOK INSURANCE COMPANY; et al.,**
**Defendants,**

**Claude James Ayliffe, on his own behalf and as representative of those Underwriters at Lloyds, London, Subscribing Policy UHL 1294; Stronghold Insurance Company, Ltd.; North Atlantic Insurance Company, Ltd.; Turegum Insurance Company, Ltd.; Puritan Insurance Company; and Mutual Fire, Marine & Inland Insurance Company, Defendants–Appellants,**

**Mutual Fire, Marine & Inland Insurance Company, Defendant–Cross–Appellee.**

**Nos. 86–2127, 87–1025.**

United States Court of Appeals, Sixth Circuit.

Argued Dec. 7, 1987.

Decided Jan. 26, 1988.

Charles J. Porter (argued), Beier, Howlett, Hayward, McCann, Jones, Kingsepp & Shea, Bloomfield Hills, Mich., Konrad D. Kohl, Kohl, Secrest, Wardle, Lynch, Clark & Hampton, Farmington Hills, Mich., Janet G. Callahan, Daniel J. Zollner, Lord, Bissell & Brook, Chicago, Ill., for appellants and cross-appellee.

Michael G. Vartanian, Dickinson, Wright & Moon, Detroit, Mich., John E.S. Scott (argued), for appellee cross-appellant.

Before MARTIN, MILBURN and NORRIS, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

Defendant insurance companies appeal an order granting Ford Motor Company's motion for summary judgment. Ford cross-appeals the denial of its motion for entry of judgment.

Ford commenced this declaratory relief action alleging that excess automotive products liability insurance policies issued by Lloyds of London, Puritan Insurance Company, and Mutual Fire, Marine & Inland Insurance Company included coverage for punitive damages.[1] During policy year 1977, the period from December 15, 1976 to December 15, 1977, Ford had at least three levels of automotive products liability insurance. Ford self-insured for the first $2 million per claim. An umbrella policy issued by Northbrook Insurance Company provided the first layer of excess insurance. Lloyds, Puritan, and Mutual each provided second layer excess insurance policies. These second layer policies, being

referred to as "following form policies," followed the insuring agreements, conditions, and exclusions of the Northbrook policy.[2] The Northbrook policy contains Exclusion P.

> Except insofar as coverage is available to the Insured under the underlying insurances, set out in the attached schedule, this policy shall not apply.
>
> . . . .
>
> P. To punitive or exemplary damages awarded against any Insured.

The Northbrook policy provided umbrella coverage for automobile products liability in excess of either the limits of the underlying insurance set out in the accompanying schedule or, in the event no underlying insurance was scheduled, a $1 million per occurrence retained limit. Ford's $2 million per claims self-insurance for automotive products liability was scheduled in the Northbrook policy. The "World Wide Schedule of Underlying Policies" reads, in part, as follows:

| CARRIER, POLICY NUMBER AND PERIOD | TYPE OF POLICY | APPLICABLE LIMITS |
|---|---|---|
| (1) Various Companies and Self-Insured | Automotive Products Liability, Public Liability and Property Damage (United States) | $2,000,000 Combined Single Limit Each Claim |

The parties have stipulated that the Northbrook policy covers punitive damage awards unless coverage is excluded by Exclusion P.

In granting Ford's motion for summary judgment, the district court concluded that the Northbrook policy indisputably provided punitive damage coverage for automotive products liability claims. The district court rejected the insurance companies' contention that Exclusion P excluded coverage because Ford's primary protection was provided by self-insurance rather than by an insurance policy. The district court held that the intent of Ford and Northbrook to

---

1. In two product liability actions arising out of accidents occurring during policy year 1977, juries awarded a total of $12 million in punitive damages against Ford. See *Ford Motor Company v. Nowak*, 638 S.W.2d 582 (Tex.Ct.App.1982); *Ford Motor Company v. Stubblefield*, 171 Ga. App. 331, 319 S.E.2d 470 (1984).

2. In contrast, the policy of National Union Insurance Company, another second layer excess products liability insurer which is not a party to this appeal, was issued with an endorsement expressly excluding coverage for punitive damages.

include Ford's scheduled self-insurance as one of the "underlying insurances" and to provide punitive damage coverage was clear from (1) the written terms of the Northbrook policy and its schedule, (2) the course of conduct of Ford and Northbrook in treating Ford's self-insurance as one of the "underlying insurances" for purposes of the Northbrook policy's insuring agreements, (3) the testimony of Richard Foss, Northbrook's former vice-president and underwriter who countersigned the Northbrook policy and was primarily responsible for authoring Exclusion P, that Ford's scheduled self-insurance was understood to constitute "underlying insurances" in Exclusion P, and (4) the documentation establishing that all parties understood that the Northbrook policy would basically duplicate the coverage of the prior year's umbrella policy issued by the Home Insurance Company, which admittedly provided punitive damage coverage. Additionally, the district court, finding that Mutual specifically excluded defense costs from its indemnification obligation, rejected Ford's proposed form of judgment.

On appeal, Lloyds, Puritan, and Mutual argue that the district court erred in failing to recognize that the language of Exclusion P clearly and unambiguously required underlying insurance policy protection, admitting and relying upon the parol testimony of Richard Foss, and ignoring Ford's acknowledgment that Exclusion P required underlying insurance policy protection. On cross-appeal, Ford argues that its defense costs should be considered in calculating Mutual's obligation.

"A court's paramount responsibility is to construe a contract so as to effectuate the intent of the parties, if ascertainable." *William C. Roney & Co. v. Federal Ins. Co.*, 674 F.2d 587, 590 (6th Cir.1982) (citing *Fox v. Detroit Trust Co.*, 285 Mich. 669, 677, 281 N.W. 399 (1938)). The construction of a written insurance contract is a question of law, and the parties agree that Michigan law governs this diversity case.

■ An unambiguous contract is to be construed according to the plain meaning of its terms. *Roney*, 674 F.2d 589. The

insurance companies insist that the exclusion is susceptible to only one reasonable interpretation. Pointing to cases holding that self-insurance is not insurance, e.g., *United States v. Newton Livestock Auction Market, Inc.*, 336 F.2d 673 (10th Cir. 1964), and that the word "coverage" means "protection by an insurance policy," e.g., *Orr v. Detroit Automobile Inter–Insurance Exchange*, 90 Mich. App. 687, 282 N.W.2d 177 (1979), the insurance companies argue that Exclusion P can only mean that punitive damages would be covered by the Northbrook policy only if punitive damages were covered by an underlying policy of insurance. We do not agree.

The language of the Northbrook policy does not, on its face, require underlying insurance policy protection in order for it to cover punitive damages. To the contrary, Exclusion P can reasonably be read as treating Ford's $2 million per claim self-insurance as "underlying insurances set out in the attached schedule." First, self-insurance could reasonably be understood to be covered under the expression "underlying insurances." Second, Ford's self-insurance was set out in the attached schedule of underlying insurance. Finally, it makes no difference, in light of Exclusion P's manifest purpose of protecting Northbrook against dropping down into the position of a primary insurer, whether the initial exposure was covered by self-insurance or a conventional policy of insurance, so long as that exposure was covered.

Where the parties' intentions are subject to more than one logical interpretation, principles of contract construction may be employed to determine the parties' intent. *Roney*, 674 F.2d at 589. In Michigan, an ambiguous exclusion clause in a policy of insurance must be strictly construed against the insurer. *Id.* at 590; *Francis v. Scheper*, 326 Mich. 441, 40 N.W.2d 214 (1949). Moreover, the course of conduct of the parties to an ambiguous contract is entitled to great weight as an aid in determining the intent of the parties. *Roney*, 647 F.2d at 590; *Detroit Greyhound Employees Federal Credit Union v. Aetna Life Ins. Co.*, 381 Mich. 683, 685–86, 167

N.W.2d 274 (1969). Application of the principle of practical construction in this case persuades us that Ford and Northbrook intended Ford's scheduled self-insurance to qualify as "underlying insurances set out in the attached schedule."

The central term in Exclusion P, "underlying insurances set out in the attached schedule," is also a key term in triggering Northbrook's excess coverage. Section II of Northbrook's insuring agreements provides:

II. Limits of Liability

The Company shall only be liable for the ultimate Net Loss in excess of either

A. the amounts recoverable under the terms of the *underlying insurances as set out in the attached schedule* of underlying policies in respect of each Occurrence covered by said underlying insurances, or

B. the retained limit as stated in Declaration Item 2(c), if the Occurrence is not covered by said underlying insurances. (emphasis added)

The retained limit referred to Section II B is $1 million per occurrence. Section II, therefore, provides that Northbrook's excess coverage would be triggered when damages exceeded $1 million per occurrence unless the underlying insurances set out in the attached schedule set a higher limit. The district court found that Ford and Northbrook consistently applied the $2 million limit of Section II A. Because they interpreted the Northbrook policy as covering damages in excess of the $2 million per claim limit of Section II A, rather than in excess of Section II B's $1 million retained limit, Ford and Northbrook clearly treated Ford's $2 million per claim self-insurance as "underlying insurances as set out in the attached schedule" for the purposes of Section II. The insurance companies have suggested no reason why Northbrook would treat Ford's self-insurance as "underlying insurances as set out in the attached schedule" for the purposes of Section II but not as "underlying insurances set out in the attached schedule" for the purposes of Exclusion P.

■ The insurance companies further argue that the district court committed reversible error by admitting testimony of Richard Foss in contravention of the parol evidence rule. Foss, Northbrook's vice-president and Director of Casualty Underwriting from May 1973 through 1978, countersigned the Northbrook policy after co-authoring Exclusion P. Foss testified that the phrase "underlying insurances set out in the attached schedule" in Exclusion P was intended to include Ford's $2 million per claim scheduled self-insurance.

Under Michigan law, a court may consider extrinsic evidence of the intent of contracting parties where the evidence is not inconsistent with the terms of the written contract. *Union Oil Co. v. Newton,* 397 Mich. 486, 245 N.W.2d 11 (1976). Moreover, extrinsic evidence is admissible to indicate the actual intent of contracting parties where there is potential ambiguity in the contract. *Goodwin v. Coe Pontiac, Inc.,* 392 Mich. 195, 220 N.W.2d 664, *on reh.,* 392 Mich. 219, 224 N.W.2d 53 (1974). In light of these principles, Foss' testimony was clearly admissible.

■ Similarly, the district court properly considered other extrinsic evidence that established that Ford and Northbrook intended to treat Ford's self-insurance as "underlying insurances set out in the attached schedule." In policy year 1976, Ford's first layer excess automotive products liability insurance was provided by The Home Insurance Company. The Home policy contained a "Limits of Liability" section virtually identical to Section II of the Northbrook policy.

The Company shall only be liable for the ultimate net loss the excess of either

(a) the amount recoverable under the terms of the underlying insurances as set out in the attached schedule in respect of each occurrence covered by said underlying insurances

or

(b) $250,000.00 ultimate net loss in respect of each occurrence not covered by said underlying insurance.

The insurance companies concede that the Home policy provided coverage for punitive

damages for automotive products liability claims in excess of Ford's scheduled $1,650,000 per claim self-insurance rather than in excess of the $250,000 retained limit for claims without underlying insurance. It is, therefore, clear that the Home policy treated Ford's self-insurance program as "underlying insurances as set out in the attached schedule." Additional evidence establishes that the 1977 Northbrook policy was designed to "basically duplicate" the 1976 Home policy. Consequently, it is apparent that Ford and Northbrook intended Ford's self-insurance to continue to qualify as "underlying insurances set out in the attached schedule."

Moreover, the Northbrook policy was renewed for policy years 1978 and 1979. The 1979 policy was issued with an endorsement absolutely excluding coverage for punitive damages. In a November 1, 1978 letter, Northbrook informed Ford that this new endorsement would be added: "[O]ur Umbrella Policy will carry the same terms and conditions as expiring Policy ... with the exception that it will be endorsed to exclude punitive damages." Puritan joined Ford and Northbrook in expressly acknowledging that this represented a change in coverage. In a December 6, 1978 letter, Puritan wrote, "Renewal is as is except excluding exemplary and punitive damages."

■ The insurance companies' last argument is that Ford acknowledged in writing that Exclusion P requires underlying insurance policy protection if the Northbrook policy was to cover punitive damages. In making this argument, the insurance companies point to a November 14, 1977 letter in which Ford wrote:

We understand that the Northbrook policy will respond for punitive damages if covered by the primary insurance and such coverage is not contrary to statute or judicial interpretation.

The insurance companies argue that, unlike the testimony of Richard Foss, the November 14, 1977 letter is admissible because it is fully consistent with the terms of the policy. We agree with the insurance companies that this letter is clearly admissible,

but we do not find it conclusive evidence that Ford believed the Northbrook policy required that initial exposure to punitive damages for automotive products liability claims be covered by a policy of insurance. Indeed, we find that the statement could be reasonably read as consistent with the district court's conclusion that Ford and Northbrook considered Ford's self-insurance to be "underlying insurance set out in the attached schedule."

■ The record demonstrates that the district court properly granted Ford's motion for summary judgment. We find that Ford established conclusively that the Northbrook policy covered punitive damages for automotive products liability insurance during policy year 1977.

Finally, we consider Mutual's cross-appeal. Unlike the Northbrook policy and the following form policies of Lloyds and Puritan, the Mutual policy specifically excluded defense costs from its indemnification obligation:

The provisions of the immediate underlying policy are incorporated as a part of this policy except for any obligation to investigate and defend and pay for costs and expenses incident to the same, the amount of the limits of liability, any "other insurance" provision and any other provisions therein which are inconsistent with the provisions of this policy.

. . . .

... The sums paid as damages in settlement of a claim or in satisfaction of a judgment for which the Insured is legally liable, after making deductions for all recoveries, salvages and other insurances (whether recoverable or not) other than the underlying insurance and excess insurance purchased specifically to be in excess of this policy. "Loss" does not include investigation, adjustment, defense or appeal costs and expenses nor costs and expenses incident to any of the same, notwithstanding that the underlying insurance may provide insurance for such costs and expenses.

In computing Mutual's pro rata share of second layer excess liability, Ford charged its defense costs toward the exhaustion of

Northbrook's first layer excess obligation. Because of the express language of its policy, Mutual cannot be held directly liable for any of Ford's defense costs. Consequently, Mutual cannot be held indirectly liable for Ford's defense costs by applying these costs toward the exhaustion of the limits of the underlying insurances. The district court, therefore, properly rejected Ford's form of judgment.

The judgment of the district court is affirmed.