CLAY, Circuit Judge,
dissenting.
The record before this Court indicates that Defendant, Faurecia Interior Systems, Inc. (“Faurecia”), has raised genuine issues of material fact regarding Plaintiffs, Multimatic, Inc.’s (“Multimatic”), claim that Faurecia breached a confidentiality agreement between the parties. The record reflects both that the terms of the confidentiality agreement were sufficiently ambiguous that the district court should have considered extrinsic evidence in support of Faurecia’s interpretation, and that Multimatic may not have had exclusive ownership of the intellectual property rights to the designs at issue. I would therefore vacate the district court’s grant of summary judgment to Multimatic on Count I. Because the court’s summary judgment ruling as to liability directly affected the scope of issues set down for trial, and thus improperly narrowed the evidence and questions put to the jury, I would also vacate district court’s procedural rulings, including the procedural rulings that are the basis for Multimatic’s cross-appeal, as well as the court’s judgment awarding damages to Multimatic.
I.
Because this case turns primarily on whether there are genuine factual disputes and because the majority’s recounting of the facts is lacking in some respects, the following factual summary is presented to frame the discussion. DaimlerChrysler (“DCX” or “Chrysler”) — which is not a party in this action-contracted with Faurecia to develop and supply the instrument panel for its JS-41 product line, which included DCX’s Sebring, Stratus, and Avenger vehicle lines. Faurecia subcontracted the design and manufacture of the frame component of the instrument panel assembly, known as the cross-car beam (“CCB”). One of the companies to which Faurecia considered subcontracting the design and manufacture of the CCB was Multimatic.
In February 2004, Faurecia and Multimatic executed a Confidentiality Agreement. (ROA at 236-37.) The confidentiality agreement recognizes that each of the parties
possesses proprietary confidential information pertaining to its business and customers and possess technical information relating to its products, designs and services, including compositions, raw materials, formulations, additives, components, production processes, plant layout, engineering concepts and designs, analysis models and results, know-how, and other intellectual or industrial property, which is generally not available to the public (all of such information being herein referred to as “Sensitive Information”).
*656 (ROA at 236 (emphasis added).) The confidentiality agreement also provides that:
Sensitive Information excludes any information that is in the public domain at the time of disclosure, any information that has been made available to the receiving party by third parties not acting on the disclosing party’s behalf and not breaching a confidentiality obligation to the disclosing party and any information that the receiving party can establish by documentary evidence was in its possession at the time of disclosure by the disclosing party.
(ROA at 236.) In addition, the confidentiality agreement states that “[t]he receiving party agrees that it will use the Sensitive Information of the disclosing party only in connection with the Instrument Panel Structural Assembly Arrangement and that it will not directly or indirectly otherwise use or exploit the Sensitive Information of the disclosing party.” (ROA at 236.)
After entering into this agreement, Multimatic worked to develop CCB designs and prototypes for Faurecia. In April 2004, Multimatic submitted its initial design for the CCB. Multimatic contends that this initial design iteration, as well as all other designs and prototypes submitted to Faurecia after the parties entered into the confidentiality agreement, constituted “Sensitive Information” as defined and protected by the confidentiality agreement. Along with its designs, Multimatic also submitted an initial price quote of approximately $25 per unit, plus approximately $2.8 million in tooling costs. As the negotiations progressed, Multimatic eventually increased its estimated per-unit production price from $25 to $41, and increased its estimated tooling costs to $5.2 million.
Apparently displeased with the price quotes it was receiving from Multimatic, Faurecia conducted “market tests” to determine if Multimatic’s competitors could manufacture the CCB more cheaply. As part of those market tests, Faurecia sent the CCB designs submitted by Multimatic to other prospective suppliers. Faurecia shared Multimatic’s designs with multiple suppliers as part of multiple rounds of market tests. The parties agree that Faurecia conducted these market tests without Multimatic’s knowledge or consent.
After several months of negotiations and after Multimatic had submitted at least two CCB designs to Faurecia, the parties executed a “Pre-Development Letter of Intent” (“LOI”) addressing issues related to a potential supply agreement pertaining to the CCB. (ROA at 239-40.) The parties dispute their intent in entering into the LOI. For its part, Multimatic contends that it had developed an innovative new CCB design and insisted on a firm sourcing commitment before it submitted its design to Faurecia. Faurecia contends that the LOI was merely an agreement to negotiate in good faith. After the parties executed the LOI, Mutlimatic submitted its “Mass Savings Design” to Faurecia.
Although Faurecia approved Multimatic’s Mass Saving Design “from an engineering perspective” in December 2004, the parties continued to disagree over pricing issues. Negotiations between Faurecia and Multimatic regarding manufacture and supply of the CCB continued until the end of April 2005. During this time, Faurecia continued to conduct market tests with other prospective suppliers, again circulating Multimatic’s designs — including the Mass Savings Design — to at least three prospective suppliers.
After Faurecia obtained a lower price quote for the manufacture of the CCB from Brown Corporation (“Brown”), Faurecia sought price concessions from Multimatic. When negotiations with Multimatic failed, Faurecia awarded the JS-41 *657 CCB supply contract to Brown. Faurecia subsequently provided Brown with additional information submitted to Faurecia by Multimatic, including “CAD designs, CAE models and analysis, Multimatic’s Design Failure Mode and Effects Analysis, its Design Verification Plan & Report, and a prototype crossbeam manufactured by Multimatic.” (ROA at 1508.)
Shortly thereafter, in May 2005, Multimatic filed this action alleging that Faurecia breached the confidentiality agreement by sharing Multimatic’s designs and other purportedly proprietary information with other suppliers. Multimatic also alleged breach, anticipatory repudiation, and specific performance related to the supply “contract” reached between the parties, alleging that “Faurecia breached the contract by refusing to award the production contract to Multimatic and quoting or sourcing the part to an alternative supplier.” (ROA at 230.) In response, Faurecia claims that the confidentiality agreement did not preclude Faurecia from sharing Multimatic’s CCB designs and prototypes with other possible suppliers, despite Multimatic’s demand for such assurances. Faurecia also denies that the parties ever reached a contractual agreement regarding the production and supply of the CCB.
II.
Faurecia claims that the district court erred by granting summary judgment in favor of Multimatic on Multimatic’s claim that Faurecia breached the confidentiality agreement by sharing Multimatic’s CCB design and prototypes with other potential suppliers. Faurecia acknowledges that the confidentiality agreement protects “proprietary” information that the parties possessed at the time they entered into it, but contends that the confidentiality agreement does not address designs and other information related to the JS-41 program that the parties generated after they executed it. Faurecia contends that Multimatic did not have exclusive ownership of the designs because Faurecia had contributed to the creation of the designs and had been billed by Multimatic for those designs. Faurecia also contends that Multimatic repeatedly uploaded iterations of the its designs to Chrysler’s information-sharing computer system, and, consequently, Multimatic has disclaimed its “proprietary” rights to those designs.
As the majority also recognizes, the dis-positive question is whether a “genuine fact as to any material issue” exists with respect to Multimatic’s claim that Faurecia breached the confidentiality agreement by sharing Multimatic’s designs and prototypes with other suppliers — i.e., whether the district court properly granted summary judgment to Multimatic on liability. Certain facts are not in dispute. Most importantly, Faurecia does not dispute that it shared Multimatic’s CCB design iterations and other information with other suppliers in a series of “market tests” in 2004 and 2005. Faurecia also does not dispute that Multimatic was unaware of these market tests. Instead, Faurecia claims that summary judgment is improper because the terms of the confidentiality agreement do not preclude disclosure of these particular designs because the confidentiality agreement does not cover designs produced after the parties entered into the confidentiality agreement. Alternatively, Faurecia argues that the designs were not exclusively owned by Multimatic and so would not fall under the confidentiality agreement even if it did cover later-developed designs. The majority’s conclusory findings in favor of Multimatic on both issues are ultimately unsatisfactory because the question of liability should have gone to trial.
Under Michigan law, where the terms of a contract are unambiguous, determining its meaning is a question of law to be *658 resolved by the court. See G & A, Inc. v. Nahra, 204 Mich.App. 829, 514 N.W.2d 255, 256 (1994) (“If a contract’s language is clear, its construction is a question of law for the court.”). In construing the meaning and scope of contract terms, “[c]ontractual language is given its ordinary and plain meaning, and technical and constrained constructions are avoided.” Id. Michigan law also makes clear, however, that “the main goal in the interpretation of contracts is to honor the intent of the parties.” Mahnick v. Bell Co., 256 Mich.App. 154, 662 N.W.2d 830, 832 (2003). Therefore, “[i]f a contract is subject to two interpretations, factual development is necessary to determine the intent of the parties and summary disposition is inappropriate.” Id. at 833.
There is no doubt that the confidentiality agreement precludes the parties from sharing “Sensitive Information,” which expressly includes “engineering concepts and designs.” Faurecia contends, however, that this provision is worded in the present tense inasmuch as it refers to proprietary information that each party “possesses” at the time and thus the confidentiality agreement, when properly construed, relates only to “background information,” that is, information already possessed by the parties on the date that the parties executed the confidentiality agreement. On Faurecia’s suggested reading, the confidentiality agreement does not preclude the parties from sharing “foreground information,” that is, designs related to the JS-41 program that the parties created while operating under the agreement. Although Faurecia’s suggestion that the confidentiality agreement unambiguously relates only to “background information” is not particularly convincing, the terms of the Confidentiality agreement are sufficiently ambiguous to preclude summary judgment in favor of Multimatic.
The confidentiality agreement does not expressly distinguish between “background” and “foreground” information. Rather, the confidentiality agreement protects the parties’ “proprietary confidential information,” including “engineering concepts and designs.” Although the confidentiality agreement does not specifically include the limitation urged by Faurecia, neither does its terms specify that its protections relate to all engineering designs. Although Faurecia may not carry the day with its contention that the present-tense phrasing of the confidentiality agreement makes this limitation clear, the phrasing is ambiguous.
Additionally, while the confidentiality agreement unequivocally includes “engineering concepts and designs” within the reach of “Sensitive Information,” the scope of that protection is limited to “proprietary” information. Therefore, if, as Faurecia contends, the JS-41 designs and engineering plans at issue here were not the “proprietary” property of Multimatic, then those designs would not be subject to the restrictions of the Confidentiality agreement.
The question then becomes whether the designs created by Multimatic for the JS-41 program constitute “proprietary” information owned by Multimatic. Faurecia contends that it provided substantial input to the designs, it was billed for the design work, and that Multimatic had no intention of claiming ownership over the designs after production had begun. Taking Faurecia’s claims as true, as this Court must at the summary judgment stage, these factors create a genuine issue of material fact as to the “proprietary” status of Multimatic’s designs. The terms of the confidentiality agreement simply do not address ownership of the CCB designs that were produced after execution of the confidentiality agreement. Absent any *659 such language, this Court cannot simply read the answer to this question into the parties’ agreement, no matter what the majority sees fit to do. See Leon v. Detroit Harvester Co., 363 Mich. 366, 109 N.W.2d 804, 811 (1961) (“This Court may not vary [a contract] nor read into it some provision that the parties did not see fit to incorporate.”).
This ambiguity also can be seen in other aspects of the confidentiality agreement, including what Faurecia aptly describes as a “unilateral ‘clawback’ provision.” That provision states:
The receiving party shall immediately upon the request of the disclosing party return to the disclosing party the Sensitive Information of the disclosing party and all copies thereof that may have been or may be in the receiving party’s possession upon the request of the disclosing party or upon termination of the agreement.
(ROA at 1085.) If the scope of the confidentiality agreement is given the broad reading that Multimatic, and the majority, ascribes to it, then this provision would seem to grant Multimatic the right to clawback any previously shared designs at any time, including information designed for Faurecia and for which Faurecia already had been billed. According to Faurecia, “[i]f this clause is read to apply to foreground technology, i.e., the design being developed for the JS41 program, then the confidentiality agreement would be rendered illusory because either party could claw back the design under development at any time.” (Faurecia Br. at 28 (citing Floss v. Ryan’s Family Steak Houses, Inc., 211 F.3d 306, 315 (6th Cir.2000).))
This troubling implication of Multimatic’s suggested reading, which also leads the majority astray, is heightened by the fact that the confidentiality agreement does not speak to whether the parties could share or disclose the JS-41 designs after a supply and production contract had been entered into. As a result, Multimatic’s reading of the confidentiality agreement would permit it to withdraw its design plans at any time without regard for the fact that Faurecia already had paid Multimatic for its design expenses and regardless of any reliance costs. Multimatic does not respond to this particular argument, and the majority does not adequately address the concern. The clawback provision thus renders the confidentiality agreement susceptible to alternative interpretations that should have been resolved by a jury.
III.
Because the terms of the confidentiality agreement are ambiguous and susceptible to multiple reasonable interpretations, the courts are obliged to give effect to the parties intentions at the time. See Mahnick, 662 N.W.2d at 833 (“If the meaning of the language [of a contract] is unclear, the trier of fact must determine the intent of the parties.”). “Where a contract provides little guidance in interpreting a disputed term,” the courts “may properly look to ... the standards and practices within the relevant industry and to how the parties’ actions during the pendency of the agreement have reflected an understanding of the term.” City of Wyandotte v. Conrail, 262 F.3d 581, 586 (6th Cir.2001) (citing Booth v. N. Am. Aluminum Corp., 423 F.2d 545, 547 (6th Cir.1970), and William C. Roney & Co. v. Fed. Ins. Co., 674 F.2d 587, 590 (6th Cir.1982)); see also Meagher v. Wayne State Univ., 222 Mich.App. 700, 565 N.W.2d 401, 415 (1997) (“Parol evidence ... may be admissible to prove the existence of an ambiguity and to clarify the meaning of an ambiguous contract.”) The district court should have considered relevant information related to the parties’ understanding of whether Multimatic’s designs in fact were proprietary *660 given that Faurecia had input into the designs and the work performed by Multimatic’s design team was billed to Faurecia. {See ROA at 1292,1801-26.)
Under Michigan law, parol evidence is admissible not only to resolve an ambiguity, but also to prove that a latent ambiguity exists in the contract when the language of the contract may appear otherwise unambiguous. See City of Grosse Pointe Park v. Michigan Municipal Liability and Property Pool, 478 Mich. 188, 702 N.W.2d 106, 113 (2005) (“Because ‘the detection of a latent ambiguity requires a consideration of factors outside the instrument itself, extrinsic evidence is obviously admissible to prove the existence of the ambiguity, as well as to resolve any ambiguity proven to exist.’ ”) (quoting McCarty v. Mercury Metalcraft Co., 372 Mich. 567, 127 N.W.2d 340, 344 (1964)); see also In re Kramek Estate, 268 Mich.App. 565, 710 N.W.2d 753, 758 (2005). Extrinsic evidence has been used to show that common contract terms that appear unambiguous were latently ambiguous because they were intended to be given a slightly different meaning than they are typically given in the commercial context. See Staniszewski v. Gmnd Rapids Packaging Corp., 125 Mich.App. 97, 336 N.W.2d 10, 11 (1983) (“full back pay” typically unambiguously refers to the industry standard 40-hour work week but parol evidence indicated that the plaintiffs usual 52-hour work week was intended). In the instant case, the district court should have considered Faurecia’s contention that the term “possesses” only referred to the present situation, a plausible use of the ordinary meaning of the word, rather than to the future, as Multimatic argued and the majority concluded. Faurecia raises genuine issues of material fact as to whether the intent of the parties was for the confidentiality agreement to only cover background information, and whether the CCB designs were “proprietary” under the terms of the agreement, regardless of the temporal scope of the agreement.
The majority claims to be convinced that record unequivocally demonstrates that “Multimatic exclusively owned” the designs that Faurecia shared with Brown. (Maj. Op. at 648). From that conclusion, the majority argues that Multimatic did not lose its copyright ownership simply by uploading its designs to Chrysler’s VPN. If the majority were correct that the record is so clear as to the ownership of the designs, then its dismissal of Faurecia’s argument regarding Multimatic’s use of the VPN would be potentially convincing. However, since Faurecia has raised a genuine issue of material fact as to the proprietary nature of the designs — shared input into the designs and billing the costs of the designs to Faurecia are key pieces of evidence as to which company owned the intellectual property rights to those designs that weigh in favor of Faurecia’s argument — the majority seems to have missed the forest for the trees. Uploading the designs to the VPN would not impact Multimatic’s copyright ownership if it were settled that Multimatic was Indeed the copyright owner. Because the record is not so clear, the question of ownership— i.e., whether the designs were “proprietary” — should have gone to trial.
Because genuine issues of material fact exist, the district court should not have granted summary judgment and the majority should not have upheld that ruling. See Mahnick, 662 N.W.2d at 833 (“Because the contract is subject to more than one reasonable interpretation, factual development is necessary to determine the intent of the parties and summary disposition is inappropriate.”).
I therefore respectfully dissent.