NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0277n.06
CASE NO. 16-3140

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
May 18, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, as Liquidating Agent of St. Paul Croatian Federal Credit Union, | ) ) ) ) ) | |
| *Plaintiff-Appellant*, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| CUMIS INSURANCE SOCIETY, INC., | ) ) | |
| *Defendant-Appellee*. | ) ) | |

Before: MERRITT, BATCHELDER, and ROGERS, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge.** The plaintiff appeals the findings and judgment from a bench trial that the plaintiff is not entitled to a declaration of coverage under a fidelity bond issued by the defendant for losses arising from employee dishonesty. Because the defendant credit union's directors knew of the employee dishonesty well before the bond was issued, and therefore that bond terminated before it was actually effective, we AFFIRM.

**I.**

The St. Paul Croatian Federal Credit Union ("St. Paul") had served the members of its associated parish since 1943. It operated under federal regulation and National Credit Union Administration ("NCUA") oversight. At the relevant times, Robert Calevich and Joseph Plavac were long-standing members of its Board of Directors. Anthony Raguz, the Chief Operating Officer, managed the operation and in 2000 began to take bribes in exchange for fraudulent

loans. By 2010, Raguz had taken over $1 million in bribes and lost St. Paul some $72.5 million due to fraudulent loans.

In 2010, the NCUA became suspicious, confirmed its suspicions, and took control of St. Paul. Within a week, the NCUA placed it under conservatorship and then liquidation. But when the NCUA filed a claim with Cumis Insurance to collect on a fidelity bond, which was to provide $5 million in coverage for employee or director dishonesty, Cumis denied coverage.

The NCUA sued Cumis in federal court, seeking a declaratory judgment that its claims were covered by a fidelity bond issued to St. Paul in February 2010 (the "2010 Bond"), and seeking compensatory damages including interest and attorneys' fees. The parties consented to a bench trial by a magistrate judge, who conducted a four-day trial in December 2015. The magistrate judge found that the 2010 Bond's termination provision applied to deny coverage and, accordingly, ruled in favor of defendant Cumis. *NCUA Board v. Cumis Ins. Society, Inc.*, No. 1:11-cv-1739, 2016 WL 165379 (N.D. Ohio, Jan. 14, 2016). The magistrate judge explained that, to conceal his fraud, Raguz had prepared falsified financial reports that he submitted to the St. Paul Board for monthly review and to the NCUA on a quarterly basis. In every monthly report from January 2005 to January 2010 (and every quarterly report from 2003 to 2008), Raguz falsely reported the loan-repayment delinquency rate as zero—this reporting covered all loans offered by St. Paul, including real estate loans, credit card loans, unsecured loans, and share-secured loans. There were, in fact, actual reportable delinquencies but Raguz falsely reported zero delinquencies because he believed delinquent loans would draw the attention of the Board or the NCUA, and that such increased scrutiny would reveal his fraudulent scheme. The magistrate judge found Raguz's testimony on these issues credible.

2

Cumis had argued that coverage for Raguz had terminated years earlier, when a Board member (specifically, Calevich) knew that Raguz had falsely reported zero delinquency rates to the Board and the NCUA. The 2010 Bond's termination provision states, in relevant part:

9. Termination Or Limitation Of Coverage For Employee Or Director

1. This Bond's coverage for an 'employee' or 'director' terminates immediately when one of your 'directors,' officers or supervisory staff not in collusion with such person learns of:

a. Any dishonest or fraudulent act committed by such 'employee' or 'director' at any time, whether or not related to your activities or of the type covered under this Bond[.]

. . .

3. Termination of coverage for an 'employee' or 'director' under paragraphs 1. or 2. above terminates our liability for any loss resulting from any act or omission by that 'employee' or 'director' occurring after the effective date of such termination.

Cumis asserted that coverage for Raguz terminated before the inception of the 2010 Bond because Calevich knew—prior to February 2010—that Raguz had committed dishonest acts by repeatedly failing to disclose reportable delinquencies to the Board and the NCUA.

At trial, Calevich testified that (1) he "knew in fact there had to be at least some delinquencies" based on his prior experience as St. Paul's secretary-treasurer; (2) the Board had concerns about the zero delinquency rate; (3) the Board raised these concerns to Raguz from time to time; and (4) Raguz never provided a solid answer to the Board's concerns. In the opinion, the magistrate judge quoted Calevich's testimony at length and ultimately concluded:

[P]rior to February 10, 2010, *Calevich 'learned of' a dishonest or fraudulent act committed by Raguz within the meaning of the 2010 Bond's Termination provision*. More specifically, … prior to February 10, 2010, *Calevich knew Raguz was submitting financial reports to the Board that reported a zero delinquency rate when, in fact, there were 'reportable' delinquencies at St. Paul.…*

. . .

Calevich also testified that, during the entire seven year time period that he served as St. Paul's secretary/treasurer (1998 to 2005), there were delinquencies at St. Paul. The Board, including Calevich, became concerned when the reported delinquencies suddenly 'stopped.' *This was because, based on his*

*long-time experience as a Board member, Calevich 'knew in fact there had to be at least some delinquencies' at St. Paul*. The Board was so concerned, in fact, that it raised this issue directly with Raguz 'from time to time,' which implies the Board questioned Raguz regarding the zero delinquency rate on more than one occasion. Raguz… never provided a 'solid answer that [the Board] could rely on.'

Taken as a whole, the above testimony and evidence shows that *Calevich knew Raguz was falsely representing that St. Paul had a zero delinquency rate* in financial reports to the Board. As set forth above, Calevich's twenty-six years as a Board member provided him extensive familiarity with the composition and nature of St. Paul's loan portfolio. It is undisputed that Calevich knew St. Paul carried tens of millions of dollars in non-share secured loans throughout the relevant time period. Moreover, Calevich's trial testimony establishes that he knew such non-share secured loans were inherently 'riskier' (i.e., subject to delinquency) than share-secured loans. Indeed, Calevich acknowledged there were always delinquencies at St. Paul while he was secretary/treasurer. The Court finds this testimony credible, and notes it is consistent with long-time Board member Joe Plavac's testimony that, between 1986 and 2001, there were delinquencies 'each and every month and year at St. Paul's' at a rate of 1 to 2 %.

Significantly, *when 'the reported delinquencies suddenly stopped,' Calevich testified he became concerned because he 'knew, in fact, there had to be at least some delinquencies'* based on his own experience as a Board member. Indeed, when asked if he was aware that there were delinquencies between 2005 and 2010 despite 'the zero on the financial statement,' Calevich acknowledged that he 'would have to assume that there must be something delinquent.' The Court finds that this testimony, combined with Raguz's subsequent refusal to provide a 'solid answer' in response to the Board's inquiries about the sudden lack of reportable delinquencies, *establishes that Calevich 'learned of' Raguz's dishonesty within the meaning of the 2010 Bond's Termination provision*.

*Cumis Ins.*, 2016 WL 165379 at \*16-17 (editorial marks omitted; emphasis added).

The important premise behind this analysis is that, through its termination provision, the bond anticipated (and mandated) that the credit union's directors would be vigilant in their oversight of their employees; that failure to exercise that vigilance would terminate the bond's coverage; and that the directors clearly and repeatedly failed to police Raguz despite recognizing the obvious evidence that something was amiss, which pointed to Raguz's dishonesty.

The NCUA appeals the magistrate judge's denial of coverage.

**II.**

**A.**

The NCUA claims that the magistrate judge applied the wrong test and found only that Calevich *should have known* of Raguz's dishonest act, whereas the bond's termination provision requires that Cumis prove that Calevich *actually knew*. After careful review of the opinion, we do not agree that the magistrate judge found only that Calevich should have known of Raguz's dishonest act. We conclude instead—as is particularly apparent from the foregoing passage—that the magistrate judge decided that Calevich *actually knew* of Raguz's dishonest act.

**B.**

The NCUA argues that the magistrate judge's findings of fact (that led to the conclusion that Calevich knew of Raguz's dishonest act) are "against the manifest weight of the evidence." But we do not review this for manifest weight; we review such fact findings for clear error:

> On an appeal from a judgment entered after a bench trial, … findings of fact are reviewed for clear error.… If the district court's account of the evidence is plausible in light of the entire record, this court may not reverse that accounting, even if convinced that, had it been sitting as trier of fact, it would have weighed the evidence differently. This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts.

*Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 655 (6th Cir. 2016) (editorial marks, quotation marks, and citations omitted). Therefore, no matter how we might weigh the evidence, the question is whether the account is "plausible." Here, the magistrate judge's account is certainly plausible. In fact, it appears correct. We have no power to reverse the decision.

**C.**

The NCUA argues—and the dissenting opinion agrees—that because the 2010 Bond is a claims-made bond that covers "loss discovered . . . while the Bond is in effect . . . regardless of when the act or acts causing or contributing to such loss occurred," R. 1-2 at 72 (Condition 10),

and continues in force until canceled, the termination provision does not—as the magistrate judge held—terminate all coverage entirely, but instead merely "terminates [Cumis's] liability for any loss . . . occurring after the effective date of such termination," R. 1-2 at 72 (Condition 9.3), that being the date of the discovery of the employee dishonesty, R. 1-2 at 71 (Condition 9.1.a).  Argued more directly: Cumis must cover the loss that occurred prior to the discovery of employee dishonesty.  The NCUA further argues—though the dissent does not address this aspect—that such "coverage remains for any loss . . . occurring prior to termination, whether such termination occur[red] before or after the inception of the 2010 Bond."  Apt. Br. at 46.[1]

The dissent points out that the magistrate judge did not make a specific finding as to either the discovery-of-loss date ("never reached the issue")[2] or the discovery-of-employee-dishonesty date ("did not pinpoint a precise date, but found that this occurred sometime before 2010"), and concludes that we should remand for a determination of those dates and—if the loss was discovered in 2010 and the employee dishonesty was discovered after the accrual of some loss—a further determination of the amount of coverage.  The NCUA, however, argues that such further findings are unnecessary because, even accepting Cumis's claim that Calevich learned of Raguz's dishonesty as early as 2005, record evidence proves at least $7 million in loss by the end of 2004, which exceeds the Bond's $5 million limit of liability.  Apt. Reply Br. at 17-18.

---

[1] It perhaps bears repeated clarification that the NCUA sued Cumis on only the 2010 Bond, which took effect on February 11, 2010.  R. 1-2 at 3 ("The Annual Bond Period begins at 12:01 a.m. on 02/11/2010 and ends at 12:01 a.m. on 02/11/2011.").  Although St. Paul had purchased fidelity bonds from Cumis annually since at least 2002, the NCUA did not make claims on any earlier annual bonds and does argue that any are at issue in this case.

[2] In the bench trial before the magistrate judge, Cumis had pressed two bases to deny coverage: either the termination provision or the discovery-of-loss provision.  *See Cumis Ins.*, 2016 WL 165379 at *9.  In framing the latter: "With respect to Discovery of Loss, [Cumis] argues [that the] alleged loss is not covered because the loss was discovered 'well before' the Bond's February 2010 effective date … no later than 2008…."  *Id.* (citation and quotation marks omitted).  But the magistrate judge did not decide that contention because it found the termination-provision argument determinative.  *Id.* (explaining that "[b]ecause it is determinative of the instant action, the Court begins (and ends) with [Cumis]'s argument regarding the 2010 Bond's Termination provision").

6

Cumis counters that the NCUA waived this argument but even if it did not, the argument is wrong. Instead, because the discovery of employee dishonesty occurred before the 2010 Bond's start date, coverage under that particular bond never took effect. Ape. Br. at 24-28.

To begin with, Cumis argues that the NCUA waived this argument by failing to raise it to the magistrate judge in the underlying proceedings. Generally, an argument that was not clearly asserted below is waived on appeal, *see Knall Beverage, Inc. v. Teamsters Local Union No. 293 Pension Plan*, 744 F.3d 419, 424 (6th Cir. 2014), and we exercise our discretion to ignore this general rule "only when it would produce a plain miscarriage of justice or when there are exceptional circumstances that militate against finding a waiver," *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 615 (6th Cir. 2014) (citation and quotation marks omitted).[3] The NCUA claims that it did raise this argument sufficiently to preserve it for appeal or, if not, that we should accept it anyway because it is a pure question of law that threatens a "miscarriage of justice" if Cumis is able to avoid coverage that it had promised under the 2010 Bond.

So the preliminary question is whether the NCUA actually raised this argument in the proceedings below (and if so, how clearly or fully); "this argument" being that the 2010 Bond's termination provision does not terminate coverage for Raguz entirely and preemptively nullify the 2010 Bond, as the magistrate judge held, but instead merely cuts off coverage at the discovery of Raguz's dishonesty, such that Cumis remains liable for pre-discovery losses even though this termination occurred before the inception of the 2010 Bond. The NCUA points us to a footnote in its summary-judgment briefing as evidence that it had argued "that termination

---

[3] In deciding whether to discard an argument as waived or to instead ignore our general rule and address it for the first time on appeal, we have identified certain factors: "(1) whether the issue newly raised on appeal is a question of law, or whether it requires or necessitates a determination of facts; (2) whether the proper resolution of the new issue is clear and beyond doubt; (3) whether failure to take up the issue for the first time on appeal will result in a miscarriage of justice or a denial of substantial justice; and (4) the parties' right under our judicial system to have the issues in their suit considered by both a district judge and an appellate court." *Hayward*, 759 F.3d at 615.

occurs only prospectively." *See* Apt. Reply Br. at 18 (citing MSJ Reply Br., R. 99, PgID 1468 n.7). It is far from clear, however, that this footnote actually asserts that proposition, much less that it suffices to show a clear or full assertion of the present argument.

In moving for summary judgment, Cumis sought rescission of the 2010 Bond on the basis that Raguz, as St. Paul's authorized representative, had lied on the annual bond application forms by denying any knowledge of any "act, error, or omission" that might give rise to a claim. R. 88-1 at 2-3.[4] The NCUA answered that, while "[t]here is no dispute that [Raguz] lied in completing the unincorporated applications[,] CUMIS failed to draft its Bond in a manner that afforded it the right of rescission." R. 98 at 12.[5] The magistrate judge agreed with the NCUA, concluding that, to effect rescission under Ohio law, pursuant to *Allstate Insurance Company v. Boggs*, 271 N.E.2d 855 (Ohio 1971), a bond must expressly incorporate the application or state that any material misrepresentation will render the bond void ab initio—the 2010 Bond did neither. R. 102 at 30-34. Cumis had alternatively invoked the Bond's termination provision, arguing that coverage terminated in April 2008 when one Mirjana Zovkic knew of Raguz's dishonesty. R. 88-1 at 7. The NCUA answered that the termination provision did not apply because Zovkic was not "supervisory staff" and did not actually know of Raguz's dishonesty, R. 98 at 15-19; the NCUA did not raise the present argument at that time. In fact, in its own motion for summary judgment, the NCUA appears to have argued an opposite theory, asserting that "the termination condition could only be triggered after the effective date of the policy at issue, in this case [after]

_____

[4] The application forms in the record, R. 88-2, cover select years, the latest being 2008, but they all require the applicant to explain any "yes" response to these questions and the latest two (2007 and 2008), which are identical, both include the statement: "It is agreed that if such knowledge or information exists, any claim or action subsequently arising therefrom shall be excluded from this coverage." R. 88-2 at 2, 4.

[5] The NCUA also argued that Cumis could not rescind the Bond because Raguz did not lie on the application in order to obtain insurance, but "to cover up the fraud that had already occurred." R. 98 at 8. In reply, Cumis argued that this was irrelevant given that Cumis relied on those lies in providing coverage, which the NCUA had just admitted had "already occurred," and emphasized the obvious point that: "No insurance company issues insurance for losses already suffered. That is the reason why such questions are on the application." R. 100 at 6.

February 11, 2010." R. 90 at 27. The magistrate judge, finding genuine issues of material fact as to whether Zovkic qualified as a supervisor or knew of Raguz's dishonesty, denied summary judgment. R. 102 at 43. The magistrate judge acknowledged a legal dispute between the NCUA's view that dishonest acts could trigger termination only after the policy's effective date and Cumis's view that such acts would trigger termination even prior to the policy's taking effect, but declined to decide it because the fact dispute remained as to whether St. Paul had actually discovered Raguz's dishonesty prior to the 2010 Bond's effective date. R. 102 at 45.

Leading up to trial, Cumis filed a trial brief in which it argued, among other things, that the termination provision removed any coverage under the 2010 Bond for Raguz's acts:

> Simply stated, the bond's coverage for Raguz terminated when any one of the Credit Union's Board members, officers, or supervisory staff members learned of 'any dishonest or fraudulent act committed by (Raguz) at any time, whether or not related to your activities or of the type covered under this Bond.' (Bond, Condition 9.). . . . In this case, the Board, including Mr. Plavac and Mr. Calevich, became aware that Raguz was dishonestly reporting zero delinquencies years before any claim was made. . . . As such, coverage terminated for Raguz at the earliest of those moments. Since the claim was made by the Credit Union in April 2010 and coverage was not applicable for Raguz under the 2010 policy, no coverage is available in this case.

R. 146 at 9 (Cumis's Trial Brief). In reply, the NCUA argued that, as used in the termination provision, the term "supervisory staff" was too ambiguous to apply here:

> Consequently, CUMIS cannot deny coverage on the basis of a[n] ambiguous term[], as it can no longer prove that its preferred definition [of 'supervisory staff'] is the only definition that can be fairly placed on the language. Accordingly, the [c]ourt should hold that CUMIS cannot bar coverage on the basis of the Termination Provision of the Bond.

R. 150 at 15 (NCUA's Trial Brief). The NCUA did not raise, at that time, the argument that it raises here: that the termination provision merely cut off coverage upon the discovery of the

9

unlawfulness and that such coverage would continue even if termination occurred before the Bond's inception.[6]

At the conclusion of the bench trial, the magistrate judge tried repeatedly to hone in on the termination-provision issue, asking the NCUA's attorney to concede that Raguz had committed a dishonest act and, therefore, "the only remaining question [wa]s whether one of [St. Paul's] directors learned of it," R. 188 at 86, but the NCUA's attorney refused to concede that the facts fit the policy (e.g., dishonesty, knowledge, supervisory role). The NCUA's attorney did not, at any point, suggest that the entire discussion was irrelevant because—under his interpretation—even if it "terminated" upon the discovery of the dishonesty, the policy would still cover the loss that had occurred prior that discovery. Moreover, in its "Post-Trial Brief," the NCUA insisted that "CUMIS failed to meet its burden to exclude coverage via the Bond's Termination exclusion," R. 191 at 11, by arguing that Cumis had not proven actual knowledge or a qualified supervisory role. R. 191 at 11-12. Rather than preserving an argument that the termination provision did not terminate *all* coverage, this appears to be a concession that Cumis could fully "exclude coverage via the Bond's Termination exclusion," *see* R. 191 at 11.

In the resulting opinion, the magistrate judge quoted the 2010 Bond's termination provision in pertinent part and then framed the termination-provision issue succinctly:

> Thus, in order to demonstrate that coverage for Raguz terminated under this provision, [Cumis] must show that: (1) a director, officer, or supervisory staff member of St. Paul; (2) not in collusion with Raguz; (3) learned of; (4) 'any

---

[6] Similarly, in its pre-trial "Proposed Findings of Fact and Conclusions of Law," Cumis asserted that "The bond was terminated as to Raguz prior to February 11, 2010." R. 152 at 10. The NCUA replied that:

> 21. CUMIS cannot deny coverage on the basis of an ambiguous term[], as it cannot prove that its preferred definition is the only definition that can be fairly placed on the language. 22. There is no evidence indicating that anyone other than Mr. Raguz had actual knowledge of his fraudulent scheme prior to 2010. 23. Mere suspicion is not enough to constitute discovery of the loss. . . . 24. Case law generally defines discovery in terms of actual knowledge, rather than merely a suspicion. 25. CUMIS cannot bar coverage on the basis of the Termination Provision of the Bond.

R. 153 at 11 (NCUA's "Proposed Findings of Fact and Conclusions of Law") (citations, quotation marks, and paragraph breaks omitted). The takeaway, again, is that the NCUA did not therein raise the present argument.

dishonest or fraudulent act' committed by Raguz, 'whether or not related to your activities or of the type covered under this Bond.' Moreover, in order to avoid liability for the claimed loss in the instant case, [Cumis] must show that these elements were met prior to the February 10, 2010 effective date of the Bond.

*Cumis Ins.*, 2016 WL 165379, at \*10. Nothing in the pre-trial argument and the presentation of evidence at trial put the magistrate judge on notice that the NCUA might object to this construction; both parties and the magistrate judge had been proceeding on this theory, that Cumis was intending to and could "avoid liability for the claimed loss in the instant case . . . [by] show[ing] that these elements were met prior to the February 10, 2010 effective date." *Id*.[7]

In short, the NCUA submitted its evidence and made its argument under an accepted or uncontested test, as framed by the magistrate judge. But after losing, the NCUA now wants to change the test and have a second bite at the apple. *See*, *e.g.*, *Dealer Computer Servs., Inc. v. Dub Herring Ford*, 623 F.3d 348, 357 (6th Cir. 2010); *In re Time Const., Inc.*, 43 F.3d 1041, 1044 (6th Cir. 1995). If the NCUA had a legitimate belief that the 2010 Bond's termination provision merely cut off coverage at the discovery of Raguz's dishonesty, such that Cumis is liable for $5 million in pre-discovery losses (even though the termination-triggering discovery occurred before the inception of the 2010 Bond), then it should have raised that theory before trial and obtained a decision on it. It did not and the NCUA has waived that theory here.

Cumis also argues that, even if we were to ignore this waiver and consider this new argument on appeal, coverage as to Raguz under the 2010 Bond never took effect because the discovery of his dishonesty occurred before the Bond's effective date. Ape. Br. at 27-28. Cumis cites a Fourth Circuit case with similar circumstances, albeit different policy language, to say:

> Since we conclude that [the employee]'s false certification of pre-advances constitutes dishonesty . . . and that [the insured] had knowledge of it before the inception of the [] policies, and since [the insured] . . . did not notify [the insurers]

---

[7] The NCUA did not file any post-judgment motion in the district court, such as a Rule 59 or 60 motion, on the basis that the magistrate judge had applied the wrong standard in deciding this determinative issue.

of [its employee]'s dishonesty, . . . under the terms of their respective policies [the insurers] cannot be held liable for [the insured]'s losses.

*C. Douglas Wilson & Co. v. Ins. Co. of N. Am.*, 590 F.2d 1275, 1279 (4th Cir. 1979) (citing with approval *City Loan & Savings Co. v. Emp'r's Liab. Assurance Corp.*, 249 F. Supp. 633, 656 (N.D. Ohio 1964)). We have elsewhere opined in a similar circumstance:

> [We construe terms] consistent with the purposes for which the bond was given. [The insured] expected to be covered, and [the insurer] to be at risk, only for brokers with no known history of fraudulent or dishonest acts. Under any other construction [the insured] could hire a veritable Rogue's Gallery of new brokers and secure their coverage under [the insurer]'s fidelity bond because their known dishonest or fraudulent acts occurred prior to their employment with [the insured]. This would be unreasonable and unnatural since a reasonable expectation would be that [an insured] would not hire dishonest brokers. A construction of a contract that is fair and reasonable will prevail over one that is not.

*William C. Roney & Co. v. Fed. Ins. Co.*, 674 F.2d 587, 591 (6th Cir. 1982). In the present case, the NCUA is arguing that Calevich (representing St. Paul) could discover Raguz's dishonesty prior to 2010 and, *without revealing this discovery to an insurer*, purchase a bond to cover any loss that might result from Raguz's dishonest acts, wait until the Bond took effect on February 10, 2010, and then "discover" the loss, file a claim, and recover for that loss. The *Roney* opinion would label this "unreasonable and unnatural"; others would label this insurance fraud and it would ill behoove us to endorse it in an overly reductive interpretation of policy provisions.

We concede that given the particular language in the 2010 Bond and the magistrate judge's actual findings (and lack of certain findings), these cases and their admonitions may not be entirely on point. They are, however, sufficient to persuade us that finding waiver on this issue presents no "exceptional circumstances" and threatens no "miscarriage of justice." We therefore hold that the NCUA waived this argument and we decline to address it here.

12

**III.**

For the foregoing reasons, we AFFIRM the judgment of the district court.

**MERRITT, Circuit Judge, concurring in the judgment.** I would affirm the judgment of the district court under the theory that CUMIS successfully rescinded the 2010 Bond. Under Ohio law, general principles of the common law of contracts, and basic fairness, the Bond was voidable for fraud. Since the plaintiff sues only under the 2010 Bond, I would not reach the question of whether the plaintiff has waived its argument in favor of remand for further proceedings on the question of the availability of coverage for fraud that occurred before Calevich learned of Raguz's dishonesty under that specific Bond.

At all relevant times, CUMIS served as St. Paul's fidelity bond insurer. Between 2004 and 2010, Anthony Raguz was responsible for completing St. Paul's application to renew its fidelity bond for the coming year. Each application asked the following question:

> Does any director, officer, committee member, or employee have knowledge or information of any act, error, or omission which might give rise to a claim against them or the credit union which would be covered under the Bond or any of its Endorsements or any of the Special Coverages?[1]

Raguz repeatedly answered "No" to that question, despite knowing that his fraudulent lending scheme could certainly give rise to a covered claim by St. Paul against him. Indeed, the parties agree that Raguz's responses to those questions were false since at least 2004.

The NCUA discovered Raguz's fraud after placing St. Paul into involuntary liquidation in 2010. After discovering the fraud, the NCUA filed a proof of loss with CUMIS in the amount of $72,546,823.72. After learning of the fraud, CUMIS returned St. Paul's premium payments on the 2010 Bond and informed the NCUA that it was rescinding the 2010 Bond on the basis of "material misrepresentations and concealment of material facts" made by Raguz on behalf of St.

---

[1] This language appears to have been updated between St. Paul's applications for the 2007 Bond and the 2008 Bond. The updated language merely broadens the question to include "volunteer[s]" and "any entity(s) which would be covered under any bond or insurance policy." Since Raguz was an officer of the company, the later amendments are not relevant to this case.

Paul on its application. The NCUA then sued CUMIS for a declaration of coverage specifically under the 2010 Bond.

Whether we apply the law articulated in the *Restatement (Second) of the Law of Contracts* or Ohio's law of contracts, Raguz's representations on St. Paul's application for the 2010 Bond amounted to material misstatements sufficient to render the Bond voidable by CUMIS.[2] The *Restatement (Second)* suggests that a contract is voidable by a party when that party's assent was "induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying." Restatement (Second) of Contracts § 164 (Am. Law Inst. 1981). A misrepresentation is material under the *Restatement (Second)* "if it would be likely to induce a reasonable person to manifest his assent." *Id.* § 162. Similarly, a misstatement of fact by the insured is sufficient to render a policy voidable under Ohio law "if it is fraudulently made and the fact is material to the risk."[3] *Boggs*, 271 N.E.2d at 858. A false statement is "fraudulently made" when the party making the statement knows of its falsity and intends that the receiving party will justifiably rely upon it. *See Fifth Third Mortg. Co. v. Chi. Title Ins. Co.*, 758 F. Supp. 2d 476, 487 (S.D. Ohio 2010) (citing *Spriggs v. Martin*, 182 N.E.2d 20 (Ohio Ct. App. 1961)).

Under either test, the Bond was voidable. The record overwhelmingly supports a finding that Raguz knew of the falsity of his response to the application's question about his knowledge of potential claims that might be covered by the Bond. Similarly, the nature of the risk covered by the Bond and the content of the question make clear that CUMIS's assent to the terms of the

---

[2] CUMIS urges us to adopt a federal rule of decision as a consequence of our federal question jurisdiction in this case. I express no opinion on the source of the rule of decision in this case because the result would be the same under both Ohio law and general principles of the common law of contracts.

[3] Ohio courts draw a distinction between insurance contracts that are "voidable" by the insurer as opposed to "void *ab initio*." *Allstate Ins. Co. v. Boggs*, 271 N.E.2d 855, 858 (Ohio 1971). However, that distinction is only relevant when the insurer seeks to avoid its obligations under a policy after liability under the policy has accrued.

Bond as issued was given in justifiable reliance upon the truth of Raguz's representation that he was unaware of any claims potentially covered by the Bond. Finally, it seems clear that Raguz intended for CUMIS to rely upon his misrepresentations—he certainly did not hope that CUMIS would do any further investigation before issuing the Bond, lest they stumble upon his fraudulent enterprise.

For the reasons stated above, I would hold that the 2010 Bond was voidable and that CUMIS's letter dated September 9, 2010 was sufficient to rescind the 2010 Bond. Accordingly, I concur in the judgment affirming the district court.

---

*Id.* at 855. I agree with Judge Batchelder's conclusion that coverage under the 2010 Bond never attached to Raguz, so liability under the Bond had not accrued when CUMIS sought to rescind the agreement.

**ROGERS, Circuit Judge, dissenting.** Because coverage for employee dishonesty under St. Paul's bond with Cumis terminated only prospectively once Calevich learned of Raguz's dishonesty, I dissent in part.

The fact that Calevich learned of Raguz's dishonesty before February 10, 2010—when the 2010 bond took effect—does not preclude the 2010 bond from covering the loss that St. Paul sustained from Raguz's fraud before Calevich learned of the dishonesty. The magistrate judge held, and the majority agrees, that St. Paul lost coverage under the bond's termination-of-coverage provision. Paragraph three of that provision reads: "Termination of coverage for an 'employee' or 'director' under paragraphs 1. or 2. above terminates [Cumis's] liability for any loss resulting from any act or omission by that 'employee' or 'director' occurring after the effective date of such termination." Here, the "effective date of termination" is when Calevich learned of Raguz's dishonesty. The magistrate judge did not pinpoint a precise date, but found that this occurred sometime before 2010. Under the plain terms of the bond, Cumis is not liable for any loss that Raguz caused to St. Paul after that date, but nothing in the bond precludes coverage for the loss St. Paul sustained before that date.[1]

A holding that this termination prevented the 2010 bond from ever taking effect conflates the bond's termination and discovery provisions. The bond's discovery-of-loss section reads:

> This Bond applies to loss discovered by you while this Bond is in effect. Discovery occurs when you first become aware of facts which would cause a reasonable person to assume that a loss of the type covered under this Bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred.

---

[1] Judge Batchelder correctly contends that the NCUA did not make this argument to the magistrate judge below. But this court's rules regarding waiver are not absolute. *United States v. Ellison*, 462 F.3d 557, 560–61 (6th Cir. 2006). We may exercise discretion in a case like this, in which the parties have fully briefed a question of law that was not raised in the court below, to decide an issue that is otherwise waived. *See id.*

Thus, if St. Paul discovered Raguz's fraud in 2010 (the magistrate judge never reached this issue), the loss that the fraud caused is covered under the 2010 bond, regardless of when the fraud occurred. Of course, the covered loss would be cut off as of the termination date sometime prior to 2010, but there would be coverage nevertheless. Just because Calevich "learned of a dishonest act" prior to 2010 does not mean that St. Paul "discovered the loss" before the 2010 bond took effect; the two are distinct concepts under the bond. As the magistrate judge recognized, learning of an employee's dishonest act means having knowledge of any "conduct that shows a want of integrity or breach of trust." In contrast, discovering loss means learning that something has sparked coverage under the bond—a narrower concept. It is entirely possible, then, that St. Paul could have triggered the bond's termination provision before February 10, 2010, without discovering loss until after that date.

Therefore, the possibility remains that St. Paul is entitled to coverage for the loss it sustained from Raguz's fraud before Calevich learned of Raguz's dishonesty.[2] I would remand to the magistrate judge to determine whether that is the case and, if so, the amount of coverage.

---

[2] Under Ohio law, an insurer may not cancel a voidable policy "to avoid liability arising under the policy after such liability has been incurred." *Goodman v. Medmarc Ins.*, 2012-Ohio-4061, 977 N.E.2d 128, at ¶ 23 (quoting *Allstate Ins. Co. v. Boggs*, 271 N.E.2d 855, 857 (Ohio 1971)).